UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOSEPH GRAY,

                    Plaintiff,

        -against-

CITY OF NEW YORK, THE CITY OF NEW
YORK DEPARTMENT OF EDUCATION, and
JEROD RESNICK, individually,

                    Defendants.
-------------------------------------------------------------------X

**<u>MEMORANDUM AND
ORDER</u>**

08-CV-2840 (NGG) (JMA)

APPEARANCES:

Ambrose W. Wotorson, Jr.
Law Offices of Ambrose Wotorson
26 Court Street
Suite 1811
Brooklyn, NY 11242
     *Attorney for Plaintiff*

Daniel Chiu
Corporation Counsel of the City of New York
100 Church Street, Room 2-170
New York, NY 10007
     *Attorney for Defendants*

**AZRACK**, **United States Magistrate Judge:**

      On July 16, 2008, plaintiff Joseph Gray filed this action against the City of New York

("City"), the City of New York Department of Education ("DOE"), and Jerod Resnick, in his

individual capacity (collectively "defendants"). Compl., ECF No. 1. Plaintiff alleges race

discrimination and retaliation in violation of 42 U.S.C. § 1981 and the Equal Protection Clause

of the Fourteenth Amendment. Second Am. Compl., ECF No. 27. Defendants have filed a

motion for summary judgment and the parties have consented to have me rule on the motion.

ECF Nos. 35, 46, 54. For the reasons explained below, the motion is granted.

Plaintiff's primary discrimination and retaliation claims concern the termination of his employment as a teacher after he allegedly attended a school dance while intoxicated and attempted to dance with a student. Those claims are utterly meritless. As discussed below, plaintiff's misconduct at the dance was reported by multiple sources and was substantiated after an independent investigation.

## I.     BACKGROUND

### A.     Plaintiff's Employment with the DOE

Plaintiff was employed as a teacher by the DOE from 2001 through August 2005. Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 3, ECF No. 47[1]; Exs. to Aff. of Ambrose Wotorson in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Ex."), Aff. of Joseph Gray ("Gray Aff.") ¶ 1, Pl.'s Ex. 30, ECF No. 43. Plaintiff, who is African-American, began working as a substitute teacher in 2001 and became a full-time probationary teacher in September 2003.[2] Defs.' 56.1 ¶¶ 2-3. Plaintiff worked at the High School of Graphic Communication Arts ("HSGCA") for the entire period of his employment with the DOE. Id. ¶ 4. Resnick became the principal of HSGCA in February 2003. Id. ¶ 7. Plaintiff was eventually terminated in the summer of 2005, prior to receiving tenure. Dep. of Joseph Gray ("Gray Dep.") 15, Pl.'s Ex. 29.

Plaintiff had a "Performing Arts Radio" license pursuant to which he was licensed to teach video production. Pl.'s Ex. 31; Gray Aff. ¶ 2. After plaintiff was hired as a substitute, he taught photography, which he was teaching when Resnick began working at HSGCA in February 2003. Defs.' 56.1 ¶ 8(b); Gray Dep. 26-28; Pl.'s Exs. 1-4. Plaintiff maintains that when he

---

[1]  All citations to defendants' 56.1 statement refer to facts that plaintiff does not dispute. Plaintiff does not contest 26 of the 34 paragraphs in defendants' 56.1 statement. Pl.'s Rule 56.1 Statement ("Pl.'s 56.1"), ECF No. 53.

[2]  Although plaintiff testified that he became a full-time probationary teacher in September 2002, multiple DOE records indicate that he did not become a full-time probationary teacher until September 2003. Exs. to Decl. of Daniel Chiu ("Defs.' Ex."), Defs.' Ex. D, ECF No. 49; Exs. to Reply Decl. of Daniel Chiu in Further Supp. of Mot. for Summ. J. ("Defs.' Reply Ex."), Defs.' Reply Ex. C, ECF No. 51.

became a full-time probationary teacher, he was hired to fill the photography position left vacant by a retiring teacher. Gray Dep. 28. However, at some point during 2003-2004 school year (most likely at the beginning of the year), plaintiff was assigned to teach health and hygiene. Defs.' 56.1 ¶ 8(b); Gray Dep. 26-27. Plaintiff taught health and hygiene during the first semester of the 2003-2004 school year and then taught at least one photography class during the second half of that school year.[3] Pl.'s Exs. 7-9; see also Second Am. Compl. ¶ 9(f) (alleging that plaintiff taught "a Photography class" in Spring 2004 after a regular teacher went out sick).

From the beginning of his employment through the end of the 2003-2004 school year, plaintiff received satisfactory evaluations and observation reports, including a satisfactory annual evaluation in June 2004 signed by Resnick. Pl.'s Ex. 10; Gray Aff. ¶ 3. In 2003, Resnick also sent two letters to plaintiff thanking him for participating in after-school activities such as the school dance. Pl.'s Exs. 5-6. In April 2004, plaintiff was accused of corporal punishment for calling a student "stupid." Defs.' Ex. O. Resnick, however, found the charge to be unsubstantiated. Id.

**B.     Placement in the Absent Teacher Reserve for the 2004-2005 School Year**

For the 2004-2005 school year, Nancy Opitz, a white female who had been a student teacher at HSGCA the prior year, was hired by Resnick and assigned to teach photography classes. Defs.' Reply Ex. B; Dep. of Jerod Resnick ("Resnick Dep.") 34, Pl.'s Ex. 28; Gray Aff. ¶ 6; Gray Dep. 18. Unlike plaintiff, Opitz had a photography license. Resnick Dep. 34. According to Resnick, it is "preferable" that teachers be licensed for the specific classes that they teach. Resnick Dep. 37. Both New York State and New York City "push[ed] principals" to ensure that all teachers possessed licenses for the classes they taught. Id. Resnick, however,

---

[3] Although plaintiff testified that he taught photography classes every day during one semester, plaintiff does not identify whether this occurred during the 2002-2003 school year or the 2003-2004 school year. Gray Dep. 28.

concedes that in 2004 and 2005 he likely had some teachers teaching courses for which they were not licensed. Id. at 37-38.

The same year that Opitz was hired, plaintiff was "excessed" and placed in the Absent Teacher Reserve ("ATR").[4] Defs.' 56.1 ¶ 8(c); Gray Dep. 16, 18; Resnick Dep. 41; Defs.' Reply Ex. C.

Teachers are usually placed in the ATR when a school has excess staff due to reductions in enrollment or funding. Resnick Dep. 48. Both tenured and probationary teachers can be placed in the ATR. Id. A teacher can challenge an ATR placement by establishing that someone with the same license and less seniority was not excessed. Id. at 49.

Placement in the ATR relegated plaintiff to serving as a full-time substitute. Resnick Dep. 28; Gray Aff. ¶ 7. Once he was placed in the ATR, plaintiff was assigned to different classes, Pl.'s Ex. 12, and no longer taught any photography classes full-time. Being placed in the ATR did not decrease plaintiff's salary or benefits. Gray Dep. 20. Plaintiff, however, maintains that the ATR placement "took [him] off the tenure track." Gray Aff. ¶ 7.

According to Resnick, plaintiff was excessed and placed in the ATR because there were not enough video production classes to warrant hiring plaintiff as a full-time teacher. Resnick Dep. 41, 44, 46. At the time, the school only had two video classes; those classes were assigned to Elizabeth Torres, who is not African-American. Id.; Gray Aff. ¶ 8. The record does not

---

[4] In his deposition testimony, Resnick appears to use the term "excessed" interchangeably with the concept of a teacher being placed in the ATR. See Resnick Dep. 48-49. There is evidence indicating that plaintiff was placed in the ATR at the beginning of the 2004-2005 school year. See, e.g., Pl.'s Ex. 12 (Nov. 8, 2004, letter from Resnick noting that plaintiff was in the ATR at the time). However, a January 24, 2005, letter from Resnick to plaintiff states that due to staffing reductions, plaintiff would be "declared in excess effective February 1, 2005." Pl.'s Ex. 15. Neither party attempts to explain this apparent discrepancy.

indicate which other classes Torres taught at the time. Torres, who was tenured and a full-time teacher since 1995, had the same photography license as Opitz.[5] Defs.' Reply Ex. F.

There is a factual dispute as to whether Torres' photography license covered the video classes that she taught. At his deposition, Resnick testified that Torres was teaching in her license area. Resnick Dep. 39. However, his testimony was somewhat equivocal when he was directly asked if video classes were within Torres' license area. Id. at 40. Also, in addition to Resnick's testimony, plaintiff's affidavit asserts that Torres was teaching outside of her license area. Gray Aff. ¶ 8.

At some point after Opitz was hired, plaintiff asked Resnick why the photography classes were given to a white and inexperienced teacher. Gray Dep. 31; Gray Aff. ¶ 9. Plaintiff, however, does not identify when he raised this issue with Resnick.

## C.     Corporal Punishment Incidents

After an allegation of corporal punishment was raised against plaintiff stemming from an incident on October 27, 2004, plaintiff submitted a statement detailing his version of the events. Pl.'s Ex. 11; see also Gray Aff. ¶ 11. According to plaintiff, during class, two students had moved their chairs out of the row and were playing cards. Pl.'s Ex. 11. When plaintiff told them to stop and attempted to move the chairs back, one of the students held on to the chair to prevent plaintiff from moving it. Id. The student then got "up in [plaintiff's] face," bumping plaintiff's chest and arguing with him. Id. During this confrontation, an unexpected cough struck plaintiff and he did not have time to turn away or cover his mouth before coughing in the student's face. Id. The student then became more confrontational and threatened to "get [plaintiff] after school." Id. Plaintiff responded, "let's settle it now." Id. Plaintiff followed the student towards

---

[5]     The record does not explain why Resnick hired Opitz to teach photography when Torres, who also had a photography license, was already working at the school and was teaching at least some classes outside of her license area. Plaintiff, however, does not raise any arguments regarding this point.

the classroom door; however, when the student stepped outside of the classroom, plaintiff shut the door behind him. Id. Security then took the student away. Id. Later that day, the police came to the school and asked plaintiff if he wanted to press charges against the student; plaintiff declined. Gray Dep. 42. That same day, Assistant Principal Peter Mercado spoke to plaintiff about the incident and threatened to send plaintiff to the "rubber room."[6] Gray Dep. 42-44. Resnick also interviewed plaintiff about the allegations. Resnick Dep. 31.

On November 8, 2004, Resnick issued plaintiff a letter criticizing plaintiff's conduct and sustaining the allegation of corporal punishment against him. Pl.'s Ex. 12. The letter's factual account of the incident largely tracks plaintiff's version of events. Id. Resnick stressed that a teacher's responsibility is to "de-escalate incidents" and outlined a number of ways plaintiff could have accomplished this, including "stepping back from the student," "turning your head or covering your mouth when coughing," and not using inflammatory words that indicate a willingness to fight a student. Id.; see also Resnick Dep. 25-26 (discussing how plaintiff could have reacted differently and the dangers inherent in the approach taken by plaintiff). Resnick's letter did acknowledge the difficulties that plaintiff faced as an ATR teacher who had to cover different classes. Pl.'s Ex. 12. Nonetheless, the letter warned plaintiff that if he engaged in this type of behavior again, he may receive an unsatisfactory rating and be terminated. Id. Subsequently, plaintiff sent Resnick a letter seeking to clarify that the student was aggressive and confrontational prior to plaintiff coughing on him and that plaintiff was unable to cover his

---

[6] During Gray's tenure at the DOE, teachers accused of misconduct could be taken out of their schools and reassigned to Temporary Reassignment Centers, known informally as "rubber rooms." See Steven Brill, The Rubber Room: The Battle over New York City's Worst Teachers, The New Yorker, Aug. 31, 2009, available at http://www.newyorker.com/reporting/2009/08/31/090831fa_fact_brill (last visited Dec. 12, 2011); Jennifer Medina, Last Day of 'Rubber Rooms' for Teachers, N.Y. Times, June 29, 2010, at A24, available at http://www.nytimes.com/2010/06/29/education/29rubber.html (discussing elimination of "rubber rooms" in 2010) (last visited Dec. 12, 2011).

mouth when he coughed because he feared that he would touch the student given their close proximity.  Pl.'s Ex. 13.

On March 18, 2005, plaintiff was involved in another incident with a student during school hours that resulted in a sustained charge of corporal punishment.  Defs.' Ex. M (March 28, 2005, letter from Resnick to plaintiff).  When plaintiff attempted to discipline a disruptive student, the student challenged him to a fight.  Id.  Other students in the class reported that plaintiff responded that he would fight the student later.  Id.  Plaintiff, however, insisted that he had jokingly told the disruptive student, "I can't fight right now."  Id.  In criticizing plaintiff's conduct, Resnick, who interviewed plaintiff about the allegations, Resnick Dep. 31, noted that he had previously criticized plaintiff's use of inflammatory words during the fall 2004 incident, Defs.' Ex. M.

Other than noting that the student became aggressive and violent towards him, plaintiff does not dispute the underlying facts outlined in Resnick's March 28, 2005, letter.  Gray Aff. ¶ 19.  Plaintiff simply insists that he tried to defuse the situation by making a joke.  Id.; Pl.'s Ex. 20.

## D.    March 18, 2005, School Dance and Plaintiff's Termination

The school held a dance on the night of Friday March 18, 2005.  Although Resnick did not attend the dance, on Monday, Resnick was informed by either Mercado or Dean Sandra Calderon that plaintiff showed up at the dance drunk.  Resnick Dep. 9-10.  Resnick also learned that a student ("Student A") had complained that plaintiff had asked her to dance and then took pictures of her.  Id. at 10.  Resnick had one of his employees report the incident to the Special Commissioner of Investigation for the New York City School District ("SCI").  Id.  SCI, which operates independently of the DOE, is responsible for investigating corruption, conflicts of

interest, unethical conduct, and other misconduct in the New York City school system.  See Bd. of Ed. of the City of New York v. Hershkowitz, 308 A.D.2d 334, 337-38 (1st Dep't 2003) (explaining background of SCI), appeal dismissed, 2 N.Y.3d 759 (2004); SCI – NYC, http://nycsci.org ("SCI . . . operates independently of the Chancellor and the Department of Education.") (last visited Dec. 12, 2011).

Within a few days of the dance, Student A, Calderon, and Michael Harmon, a school aide, all submitted written statements.  Calderon's statement indicates that at the dance she observed plaintiff "stumbling across the lobby."  Pl.'s Ex. 16; see also Resnick Dep. 81.  Harmon reported that during the dance students came up to him and told him that plaintiff was drunk. Defs.' Ex. K.  When Harmon spoke to plaintiff at the dance, he noticed a strong smell of alcohol on plaintiff's breath.  Id.  Student A's statement confirmed that plaintiff had "tried to dance with [her]."  Defs.' Ex. J.  After she told plaintiff that she did not want to dance with him, he said, "come on [Student A] let's dance."  Id.  When she walked away, plaintiff followed her and took pictures of her.  Id.; see also Resnick Dep. 68.  This made her "feel very uncomfortable."  Defs.' Ex. J.

On March 24, 2005, Santiago Taveras, the Superintendent responsible for HSGCA, sought to remove plaintiff from HSGCA and to have him reassigned to a regional office after SCI investigators informed Taveras that they had substantiated the allegations against plaintiff. Pl.'s Ex. 19 (e-mail from Taveras to Resnick and other school officials).  As discussed infra, SCI would eventually issue a formal report on June 15, 2005.  Pl.'s Ex. 22.  Plaintiff appears to have been reassigned on March 28, 2005.  See Defs.' Reply Ex. D; Gray Dep. 16.

On May 6, 2005, plaintiff's attorney sent a letter to an SCI investigator asserting, inter alia, that plaintiff had a claim of "racially discriminatory treatment." Pl.'s Ex. 21. Plaintiff's attorney requested that a copy of the letter be placed in "the case file." Id.

On June 15, 2005, SCI issued a report summarizing its investigation into the March 18, 2005, dance. Pl.'s Ex. 22. During the investigation, SCI either interviewed or received statements from Mercado, Calderon, Harmon, and Student A. Id. Those witnesses confirmed the accounts that had been previously provided to Resnick. Id. Notably, Mercado reported that plaintiff appeared to have been under the influence of alcohol at the dance and that he had smelled alcohol on plaintiff's breath. Id. at 2. When Mercado confronted plaintiff at the dance, he admitted that he had been drinking, but maintained that he was not intoxicated. Id. After Mercado instructed plaintiff to leave, plaintiff did so, but returned to the school building about ten minutes later. Id. After Mercado again ordered him to go home, plaintiff complied. Id.

When investigators interviewed plaintiff, he admitted that, after the school day had ended, he went to a bar/restaurant near the school and had food, a beer, and "a couple" of margaritas.[7] Id. at 3. Plaintiff left the restaurant around 9:00 p.m. and came to the school dance in order to take pictures for the school newspaper. Id.; see also Gray Aff. ¶ 17 (stating that the teacher in charge of the school newspaper asked him to take pictures of the dance). Plaintiff maintained that he was not intoxicated at the time. Pl.'s Ex. 22 at 3. Plaintiff admitted taking pictures at the dance, but could not recall asking Student A to dance or taking pictures of her. Id.; see also Gray Dep. 61-62. At some point during the dance, plaintiff gave his camera to another student ("Student B"). Pl.'s Ex. 22 at 3. Student B informed investigators that plaintiff deleted some pictures from the camera in order to free up memory. Id. When investigators

---

[7]  At his deposition, plaintiff testified that he did not go the bar/restaurant immediately after school, but first attended a union protest outside the school. Gray Dep. 58-59. There is, however, no evidence that plaintiff ever mentioned this protest to either SCI investigators or to Resnick.

reviewed the pictures from the camera, they discovered three photos of Student A on the camera, none of which were inappropriate.  Id.

The SCI report only summarized the results of the investigation and did not contain any disciplinary recommendations.

On June 16, 2005, Theresa Europe, a lawyer for the DOE, forwarded the SCI report to Resnick.  Pl.'s Ex. 23; Resnick Dep. 52.  Europe recommended that, if Resnick believed plaintiff was intoxicated, he should offer plaintiff the opportunity to settle the matter by admitting that he acted inappropriately and paying a monetary fine.  Pl.'s Ex. 23.  Europe believed that no further action would be necessary if plaintiff accepted this offer.  Id.  If plaintiff refused the offer, Europe recommended that plaintiff be given a strong letter of reprimand advising him that this misconduct may lead to further disciplinary action, including an unsatisfactory rating and termination.  Id.  Resnick never presented plaintiff with Europe's suggested settlement offer.  Resnick Dep. 51-52, 79.

After meeting with plaintiff on June 21, 2005, Resnick issued plaintiff a letter on June 27, 2005, indicating that plaintiff's misconduct at the dance was "inappropriate and inexcusable," and could lead to an unsatisfactory rating and termination.  Pl.'s Exs. 24, 26.  In addition to reviewing the SCI report, Resnick also conducted his own investigation into the matter, interviewing Mercado, Calderon, Harmon, and Student A.  Resnick Dep. 16.  According to the letter, Resnick's investigation revealed that plaintiff was intoxicated, asked Student A to dance, and then followed her onto the dance floor and took pictures of her.  Pl.'s Ex. 26; see also Resnick Dep. 18 (discussing Student A's account to him).

Resnick's June 27 letter also states that, during his meeting with plaintiff, plaintiff denied that he was intoxicated and insisted that he only had two drinks.  Pl.'s Ex. 26; see also Resnick

Dep. 20, 55; Gray Dep. 51. Plaintiff also denied asking Student A to dance. Pl.'s Ex. 26; Gray Dep. 51-52; see also Gray Aff. ¶ 18. Plaintiff, however, did admit that Mercado told him that he smelled of alcohol. Pl.'s Ex. 26. The Court notes that plaintiff's deposition testimony regarding his conversation with Resnick largely tracks the account of the events memorialized in the June 27 letter.[8] Gray Dep. 50-52; see also Gray Aff. ¶ 17-18.

On June 29, Resnick completed plaintiff's annual review and gave plaintiff an unsatisfactory rating. Pl.'s Ex. 25. In justifying that rating, Resnick cited to the two corporal punishment incidents as well as the SCI report and his own investigation into plaintiff's conduct at the March 18 dance. Id.; Resnick Dep. 8-9, 54.

On August 9, 2005, Taveras affirmed Resnick's recommendation to terminate plaintiff's probationary employment.[9] Pl.'s Ex. 27; Resnick Dep. 8, 80. According to plaintiff's complaint, plaintiff appealed Taveras' decision and a review hearing was held. Second Am. Compl. ¶¶ 9(s), (x). At the hearing, the DOE relied on Resnick's testimony and the documentary evidence in plaintiff's file. Id. Based on that evidence, Deputy Chancellor Carmen Farina affirmed Taveras' decision. Id. ¶ 9(s). Plaintiff's unsatisfactory rating also resulted in him being placed on an ineligible list that prevented him from teaching elsewhere. Gray Aff. ¶ 21.

**E.     Procedural History**

Plaintiff filed the instant suit on July 16, 2008, alleging that: (1) defendants subjected him to race discrimination and retaliation in violation of the Equal Protection Clause and 42

---

[8]  In an affidavit submitted in opposition to summary judgment, plaintiff asserts that, at the dance, several security guards approached him and told him that management was trying to get them to say that they had seen plaintiff intoxicated when, in fact, they had not seen him intoxicated. Gray Aff. ¶ 16. Nothing in the record indicates that plaintiff ever informed SCI or Resnick of this allegation.

[9]  The record does not clearly indicate whether Resnick's recommendation to end plaintiff's probation was a separate decision or simply the inevitable consequence of Resnick's unsatisfactory rating. Resnick's testimony suggests the latter. See Resnick Dep. 8 (stating that unsatisfactory evaluation was the written justification for why plaintiff's probation was terminated).

U.S.C. § 1981; and (2) that his placement on the ineligible list violated the Due Process Clause of the Fourteenth Amendment. Defendants moved to dismiss plaintiff's equal protection and due process claims brought under 42 U.S.C. § 1983, but did not seek to dismiss plaintiff's § 1981 claims. In an opinion dated September 24, 2009, Judge Nicholas G. Garaufis granted the motion in part and denied it in part. ECF No. 25 ("Opinion"). Judge Garaufis held, inter alia, that: (1) plaintiff failed to allege sufficient facts to state a due process claim; (2) plaintiff's retaliation claims were not cognizable under the Equal Protection Clause; and (3) with the exception of plaintiff's claims related to the two corporal punishment letters, all of plaintiff's equal protection claims regarding incidents that occurred prior to July 16, 2005, were barred by the three-year statute of limitations applicable to § 1983 claims brought in New York.[10] Id.

Plaintiff's most recent complaint abandons the due process claim and the equal protection retaliation claims. Second Am. Compl. Plaintiff, however, continues to pursue discrimination claims under both § 1981 and § 1983 (equal protection) as well as a retaliation claim under § 1981. Id. Defendants now move for summary judgment.

The Court notes that plaintiff does not contend that anyone other than Resnick and Mercado discriminated against him. Gray Dep. 17. In addition, plaintiff's papers suggest that Resnick is the only individual who retaliated against him.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome

---

[10]  In his complaint, plaintiff had alleged that he did not learn of the existence of the two letters until after July 16, 2005. Id. at 8.

of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

**B.      Claims against the City**

Defendants argue that the City is not a proper party because the DOE and the City are separate entities and plaintiff was employed by the DOE, not the City.  Plaintiff does not respond to this argument and has, thus, abandoned all of his claims against the City.  Therefore, summary judgment is granted as to all of plaintiff's claims against the City.  Plaintiff's only remaining claims are his discrimination and retaliation claims against the DOE and Resnick.

**C.      Timeliness**

Defendants argue that the only timely claims raised by plaintiff concern plaintiff's termination and placement on the ineligible list.  Plaintiff does not respond to defendants' statute of limitations argument.

As Judge Garaufis previously held, plaintiff's equal protection claims brought under § 1983 are subject to a three-year statute of limitations.  Opinion at 6; see also Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).  Therefore, with the exception of plaintiff's claims

concerning his termination and placement on the ineligible list, all of plaintiff's equal protection claims must be dismissed as untimely.[11]

Citing Patterson, defendants contend that plaintiff's § 1981 claims are also subject to a three-year statute of limitations. Although it appears that plaintiff's § 1981 claims are, in fact, governed by a four-year statute of limitations, it is unnecessary to resolve this question because, as explained infra, all of plaintiff's claims, even if timely, fail on the merits.[12]

## D.     Standard Governing Equal Protection and § 1981 Claims

The parties agree that plaintiff's equal protection and § 1981 claims are governed by the same substantive standards and burden-shifting framework employed in cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). See Patterson, 375 F.3d at 225; Gertskis v. NYC D.O.H.M.H., 375 F. App'x 138, 138 (2d Cir. 2010), cert. denied, 131 S. Ct. 2932 (2011). The only relevant exception is that, unlike under Title VII, Resnick could be held liable in his individual capacity under both § 1981 and § 1983. Patterson, 375 F.3d at 226.

---

[11] The dismissal of these claims on statute of limitations grounds does not ultimately affect the substantive analysis of plaintiff's discrimination claims set out below. As discussed infra, all of plaintiff's § 1981 claims appear to be timely and the substantive analyses for plaintiff's equal protection and § 1981 discrimination claims are identical. Moreover, although a number of plaintiff's equal protection claims are untimely, the facts related to all of those incidents could potentially still be considered as "background evidence" in analyzing plaintiff's timely equal protection claims, such as his termination. Cf. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102 (2002) (interpreting Title VII's statutory scheme and permitting use of untimely "prior acts as background evidence in support of a timely claim"). However, because the evidence plaintiff relies on is insufficient to warrant trial on his § 1981 discrimination claims, it is ultimately unnecessary for the Court to determine how the "background evidence" related to plaintiff's untimely equal protection claims should be considered in evaluating his timely equal protection claims.

[12] Although the Second Circuit stated in Patterson that there is a three-year statute of limitations for § 1981 claims in New York, 375 F.3d at 225, Patterson did not discuss Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373 (2004). Jones, which was decided a few months before Patterson, held that § 1981 claims based on certain actions that occur after the formation of an employment contract, such as hostile work environments, wrongful discharges, and refusals to transfer, are subject to a four-year statute of limitations. The applicability of Jones to the instant case is, however, not straightforward because Jones involved a private defendant, whereas here plaintiff has brought suit against municipal defendants and a municipal employee. See Ortiz v. City of New York, 755 F. Supp. 2d 399 (E.D.N.Y. 2010) (holding that although § 1983 provides the exclusive remedy against state actors for § 1981 violations, four-year statute of limitations is, nonetheless, still applicable to certain § 1981 claims pursued through the "remedial vehicle" of § 1983). But see Lawson v. Rochester City Sch. Dist., --- F. App'x ----, 2011 WL 5110203, at *1 (2d Cir. Oct. 28, 2011) (citing Jones and stating, without any discussion, that the "statute of limitations for a § 1981 claim is four years").

Title VII discrimination and retaliation claims are analyzed under the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, plaintiff must establish a prima facie case of discrimination or retaliation. Terry v. Ashcroft, 336 F.3d 128, 138, 141 (2d Cir. 2003). Once plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action taken against the plaintiff. Id. "The plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination'" or retaliation. Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff." Westbrook v. City Univ. of New York, 591 F. Supp. 2d 207, 226 (E.D.N.Y. 2008) (citing Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

To establish a prima facie case of discrimination, plaintiff must show that he: (1) belonged to a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Terry, 336 F.3d at 138.

In order to establish a prima facie case of retaliation, plaintiff must show: (1) that he participated in a protected activity that was known to the defendant; (2) he suffered an adverse

employment action; and (3) that a causal connection exists between the protected activity and the adverse employment action.  Id. at 141.

**E.      Discrimination Claims**

Plaintiff's discrimination claims, which turn on his attempts to compare himself to Opitz and Torres, cannot survive summary judgment because plaintiff had neither Opitz's photography license nor Torres' seniority.

*1.      Prima Facie Case*

Only the third and fourth elements of plaintiff's prima facie case are in dispute.

a.      Adverse Action

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Galabya, 202 F.3d at 640 (quoting Crady v. Liberty Nat. Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Id.

The parties do not dispute that the termination of plaintiff's employment and his placement on the ineligible list are adverse actions.  Defendants, however, contend that all of the other actions mentioned in plaintiff's complaint, ranging from plaintiff's placement in the ATR to the two findings of corporal punishment, fail to qualify as adverse actions.  Plaintiff's only response is that his placement in the ATR qualifies as an adverse action because this "t[ook] him

off the tenure track" and involved a "diminution of status." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Br.") at 9, ECF No. 52. As such, plaintiff concedes that the other actions in dispute do not rise to the level of adverse actions.

For the purposes of deciding the instant motion, the Court assumes that plaintiff's placement in the ATR qualifies as an adverse action. Although it appears that the ATR placement did not, in fact, remove plaintiff from "the tenure track," <u>see</u> Defs.' Reply Ex. C, the ATR placement apparently did relegate plaintiff to being a substitute teacher without any full-time classes. In any event, as explained <u>infra</u>, even assuming that the ATR placement was an adverse action, plaintiff has failed to establish that the ATR placement or the other adverse actions at issue were discriminatory.

b.     Inference of Discriminatory Intent

Plaintiff suggests that an inference of discriminatory intent arises because Resnick: (1) treated him differently than Torres, who plaintiff contends was similarly situated; and (2) replaced plaintiff with Opitz, a white teacher with less experience. However, as explained below, plaintiff has failed to establish that the ATR placement occurred under circumstances giving rise to an inference of discrimination. As such, plaintiff cannot establish a prima facie case, or, for that matter, meet his ultimate burden of establishing that the actions at issue were motivated by his race.

Plaintiff contends that he has established a prima face case based on the fact that Torres, who was also teaching outside of her license, was not placed in the ATR. Pl.'s Br. at 11-12. "A plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000). To

do so, a "plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." Id. (quoting Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997)). As explained infra, plaintiff has failed to establish that Torres was similarly situated.

The Court also notes that the fact that a "plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Plaintiff, however, does not advance this specific argument and, even if he had, it does not appear that Opitz "replaced" him when she was assigned photography classes. Although plaintiff taught photography during the 2002-2003 school year, plaintiff was a substitute teacher that year. Moreover, plaintiff taught health and hygiene during the first half of the 2003-2004 school year and appears to have only taught some photography classes during the second half of the year after another teacher went out sick. In light of this evidence, it is doubtful that plaintiff can rely on the assignment of photography classes to Opitz in order to establish the fourth element of his prima facie case. Even assuming that plaintiff could establish a prima facie case, as explained below, plaintiff cannot meet his ultimate burden of establishing that the ATR placement and the other actions taken against him were discriminatory.

### 2. Resnick's Non-Discriminatory Reason

According to Resnick, plaintiff was placed in the ATR because there were not enough video production classes to warrant hiring plaintiff as a full-time teacher.

### 3. Pretext

Plaintiff cannot show that Resnick's proffered reason for placing plaintiff in the ATR was a pretext for discrimination.

As an initial matter, the Court assumes arguendo that Resnick's hiring of Opitz and assignment of photography classes to her were linked to Resnick's decision to place plaintiff in the ATR. However, plaintiff's argument that Opitz was less experienced than plaintiff fails to show that Resnick's reason for placing plaintiff in the ATR was pretextual or that Resnick's actions were discriminatory. Opitz had a photography license and Resnick testified that New York State and New York City "push[ed] principals" to have teachers teaching within their license areas. Thus, because only Opitz had a photography license, the fact that she had less experience than plaintiff teaching photography classes does not, as plaintiff suggests, establish that he was more qualified than her to teach those classes.

Plaintiff also maintains that the fact that Torres was not also placed in the ATR is evidence of discrimination because she and plaintiff were both teaching classes outside of their licenses and were, therefore, similarly situated.[13] However, placement in the ATR is not directly analogous to situations such as discipline where failure to enforce a disciplinary standard equally across employees can give rise to an inference of discrimination. Under plaintiff's implicit logic, either he and Torres both had to be placed in the ATR or they both had to be retained and permitted to teach outside of their licenses. However, as Resnick explained, teachers are usually placed in the ATR when a school has excess staff due to decreases in enrollment or funding, and there is no evidence that HSGCA's enrollment or finances required Resnick to place two teachers in the ATR. As such, it is not surprising that Resnick retained Torres, who had more seniority than plaintiff.

Ultimately, plaintiff has failed to establish that Torres was similarly situated to him in "all material respects." Admittedly, defendants have not clearly identified the role seniority

---

[13]  Plaintiff has not argued that because he was licensed to teach video classes and Torres was not, he should have been retained instead of her. Rather, plaintiff's only argument regarding Torres is that she was similarly situated to him because she was also teaching outside of her license area.

plays in ATR placement decisions. Resnick, however, did testify that a teacher can challenge placement in the ATR by establishing that someone with the same license and less seniority was not excessed. Resnick Dep. 49. Although this testimony is not directly applicable to the instant case given that plaintiff and Torres did not have the same license, Resnick's testimony indicates that seniority is a material factor in determining ATR placements. More importantly, plaintiff bears: (1) the burden of showing that he and Torres were similarly situated; and (2) the ultimate burden of proving discrimination. It is therefore not enough for plaintiff to point to the bare fact that Torres was also teaching outside of her license area and was not placed in the ATR. Plaintiff must offer evidence indicating that, for the purposes of ATR placement, Torres was similarly situated to plaintiff in all material respects. It is plaintiff's burden to establish that Torres was similarly situated despite her seniority; he has failed to do so.

Plaintiff also argues that Resnick's justification for the ATR placement—that there were not enough video production classes to warrant hiring plaintiff as a full-time teacher—is "flimsy" because plaintiff had been teaching photography classes, not video classes. Pl.'s Br. at 11. However, the fact that plaintiff had previously taught photography classes outside of his license area does not undermine Resnick's reason for the ATR placement because only the video classes discussed by Resnick were within plaintiff's license area.

Other than the evidence discussed above relating to the assignment of photography classes and plaintiff's placement in the ATR, plaintiff does not offer any additional support for his claims that the other actions taken against him, including his termination, were discriminatory. Therefore, given that plaintiff's discrimination claims concerning the assignment

of photography classes and the ATR placement cannot survive summary judgment, all of plaintiff's other discrimination claims also necessarily fail.[14]

## F.     Retaliation under § 1981

Plaintiff's retaliation claims fail because there is no evidence undermining the reasons for the two corporal punishment letters or for plaintiff's termination.  Plaintiff's suggestion that Resnick's decisions concerning those actions were unreasonable in light of the evidence before him is meritless.  Moreover, plaintiff cannot even establish a prima facie case of retaliation based on the May 6, 2005, letter because Resnick, the alleged retaliator, was not even aware of the letter.

### 1.     Prima Facie Case

#### a.     Protected Activity

"In addition to protecting the filing of formal charges of discrimination, [Title VII] protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  However, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

_____

[14]  Even if Opitz did "replace" plaintiff, that bare fact, while relevant to plaintiff's prima facie case, has little, if any, probative value on the ultimate question of whether plaintiff was discriminated against.  See James v. N.Y. Racing Ass'n, 233 F.3d 149, 154, 155 n.1 (2d Cir. 2000) (stating that the "[t]he requirements of the McDonnell Douglas prima facie case are so minimal that they do not necessarily support any inference of discrimination" and using hypothetical to illustrate that a fact-finder could not find discrimination based solely on pretext and the fact that a plaintiff was replaced by someone outside of the plaintiff's protected class).

Although defendants do not dispute that the May 6, 2005, letter from plaintiff's counsel to the SCI investigator meets this standard, defendants do challenge plaintiff's questioning of Resnick as to why the photography classes were given to a white and inexperienced teacher. According to defendants, plaintiff's comment does not qualify as protected activity because he never complained that he was denied the classes because of his race. However, the Court assumes that, viewed in the light most favorable to plaintiff, a jury could conclude that Resnick "understood, or could reasonably have understood" plaintiff's inquiry to be a complaint of racial discrimination given plaintiff's explicit reference to Opitz's race.

b.    Adverse Action

In the retaliation context, an action constitutes an adverse employment action if the action "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

Plaintiff argues that, in addition to his termination and placement on the ineligible list, the 2004 corporal punishment letters also constitute adverse actions. Defendants do not argue to the contrary. See Defs.' Mem. in Supp. of Mot. for Summ. J. at 16 ("Defs.' Br."), ECF No. 48. As such, the Court assumes that these letters qualify as adverse actions.[15]

c.    Causal Connection

The final element of a prima facie case of retaliation is a causal link between the protected activity and the adverse action. Terry, 336 F.3d at 141. This can be demonstrated "'either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of

---

[15]   Although defendants argued that these letters did not qualify as adverse actions for the purposes of plaintiff's discrimination claims, defendants did not raise this argument with regard to plaintiff's retaliation claims, which have a lower standard for an adverse action than discrimination claims, Early v. Wyeth Pharm., Inc., 603 F. Supp. 2d 556, 577 (S.D.N.Y. 2009).

fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a [causal connection]." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001)). Courts must focus on "the permissible inferences that can be drawn from temporal proximity in the context of particular cases." Espinal, 558 F.3d at 129-30. Nonetheless, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases).

As an initial matter, the Court notes that plaintiff does not indicate when he questioned Resnick regarding Opitz. The Court, however, assumes that this took place sometime during September or October 2004. See Defs.' Br. at 17 (stating that this inquiry occurred in the fall of 2004). Because plaintiff's complaint about Opitz ("2004 complaint") appears to have occurred less than two months before the November 8, 2004, corporal punishment letter, for the purposes of plaintiff's prima facie case, plaintiff has established a causal connection between those two events.

Defendants, however, contend that the negative consequences stemming from plaintiff's conduct at the March 18, 2005, dance, including his March 28, 2005, reassignment to the regional office and June 27, 2005, unsatisfactory review, were too temporally remote from the

2004 complaint to create a causal connection. Although the gap of over four months between the 2004 complaint and the above actions would, absent other evidence, preclude any causal connection, defendants ignore the November 8, 2004, corporal punishment letter. As noted above, there is a close temporal proximity between that letter and the 2004 complaint. If plaintiff could establish that Resnick issued the November 8 letter in retaliation for the 2004 complaint, it may be possible for a jury to infer a causal connection between the 2004 complaint and the actions taken against plaintiff in the spring and summer of 2005. As such, for the purposes of plaintiff's prima facie case, the Court assumes that there is a causal connection between the 2004 complaint and the actions taken against plaintiff in 2005.

Before moving to the next stage of the McDonnell Douglas framework, the Court notes that, in addition to relying on the 2004 complaint, plaintiff also contends that there is a causal connection between the May 6, 2005, letter to the SCI investigator and the subsequent actions taken against plaintiff in June and August of 2005. Plaintiff, however, cannot establish any causal connection between those actions and the May 6 letter.

Critically, there is no evidence in the record from which it could be inferred that Resnick, the relevant decision-maker, had any knowledge of the May 6, 2005, letter. Thus, Resnick could not have possibly retaliated against plaintiff for complaining of discrimination in the May 6 letter. See Ragin v. East Ramapo Cent. Sch. Dist., No. 05-CV-6496, 2010 WL 1326779, at *25 (S.D.N.Y. Mar. 31, 2010) (holding that plaintiff's failure to offer evidence that decision-maker was aware of her protected activity at the time of promotion denial necessitated summary judgment on that retaliation claim), aff'd, 417 F. App'x. 8 (2d Cir. 2011); cf. Gordon, 232 F.3d at 117 (explaining that although corporate knowledge of a plaintiff's complaint is sufficient to satisfy the "knowledge" prong of a plaintiff's prima facie case, evidence that the specific

decision-makers responsible for the adverse action were not aware of the plaintiff's protected activity is still relevant "as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."). The May 6 letter was addressed to the SCI investigator, not Resnick. And, contrary to plaintiff's assertion, there is no evidence indicating that the May 6 letter was included in the documents that Resnick reviewed in preparing the June 27, 2005, letter and unsatisfactory evaluation. Although Resnick clearly relied on the SCI report, which was forwarded to him by Europe, there is no evidence suggesting that Resnick ever viewed the entire SCI case file, which presumably contained the May 6 letter.

In addition, the temporal proximity between the May 6 letter and the subsequent actions taken against plaintiff is insufficient to suggest retaliation because those actions were merely the culmination of a logical sequence of disciplinary measures that began prior to the May 6 letter. Cf. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Although SCI had not yet issued its final report at the time of the May 6 letter, Taveras and Resnick had already been informed that the SCI investigators were going to substantiate the allegations against plaintiff and, based on that information, Taveras removed plaintiff from the school on March 28, 2005, and transferred him to the regional office.

Finally, plaintiff argues that the May 6 letter was the "only 'event' that occurred between the 'investigation' and Resnick's eventual decision to terminate plaintiff." Pl.'s Br. at 13. That argument, however, makes little sense given that the formal SCI report was issued during this period.

Plaintiff is simply unable to establish a causal connection between the May 6 letter and any of the subsequent actions taken against him.

2. *Resnick's Non-Discriminatory Reasons*

According to Resnick, plaintiff's conduct warranted the two corporal punishment letters. In addition, Resnick maintains that he gave plaintiff an unsatisfactory rating based on the SCI report, Resnick's own investigation into the dance, and the two corporal punishment letters.

3. *Pretext*

After a defendant offers its non-discriminatory reason for an adverse action, a plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 256). "[A plaintiff] may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Taylor v. Family Residences and Essential Enters., Inc., No. 03-CV-6122, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) (citations and internal quotation marks omitted)).

It must be stressed that in discrimination and retaliation cases, "we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer,' . . . the factual validity of the underlying imputation against the employee is not at issue." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (internal citation omitted). Thus, for example, "[w]here a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the

plaintiff] . . ., but whether the employer made a good-faith business determination." <u>Kolesnikow v. Hudson Valley Hosp. Ctr.</u>, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) (citations and internal quotation marks omitted). "[I]n the absence of evidence undermining [the employer's] assertion that it believed in good faith that [plaintiff's] conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, [the employer] is entitled to summary judgment." <u>Id.</u>

"Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons." <u>Dister v. Cont'l Group, Inc.</u>, 859 F.2d 1108, 1116 (2d Cir. 1988). However, "facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." <u>Id.</u>; <u>see</u> also <u>DeMarco v. Holy Cross High Sch.</u>, 4 F.3d 166, 171 (2d Cir. 1993) ("[I]n an ADEA or Title VII case, a plaintiff may be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise."). As discussed <u>infra</u>, a number of plaintiff's pretext arguments are premised on the notion that Resnick's decisions regarding plaintiff were, based on the evidence before Resnick, so unreasonable as to suggest pretext.

Finally, it must be noted that although temporal proximity alone may be sufficient to establish a prima facie case of retaliation, the Second Circuit has recently held that "without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." <u>El Sayed v. Hilton Hotels Corp.</u>, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam).

a.     Corporal Punishment Letters

Plaintiff argues that he was unfairly disciplined for the incidents underlying the two corporal punishment letters.  Plaintiff, however, has not shown that Resnick's rationales for the letters were a pretext for retaliation.  Plaintiff's disagreement with Resnick's evaluation of plaintiff's conduct is insufficient to show pretext.  No reasonable jury could conclude that Resnick's conclusions were even unreasonable under the circumstances.  The Court recognizes that teachers have the difficult task of maintaining order in a classroom while, at the same time, avoiding confrontations with disruptive and aggressive students.  Although, in some circumstances, the line between inappropriate teacher conduct and effective classroom management may not be clear, no reasonable jury could conclude that Resnick acted unreasonably in criticizing plaintiff's actions, including his use of potentially inflammatory words and failure to de-escalate the situations that he faced.

b.     Other Actions Taken Against Plaintiff in the Spring and Summer of 2005

Because plaintiff has failed to establish that the November 8, 2004, corporal punishment letter was retaliatory, there is no longer any potential causal connection between the 2004 complaint and the actions taken against plaintiff in the spring and summer of 2005.[16]  In any event, even assuming that the temporal proximity between plaintiff's protected activities (i.e., the 2004 complaint and the May 6, 2005, letter) and the actions taken against plaintiff in the spring and summer of 2005 is sufficient to suggest some causal connection between those events, plaintiff's retaliation claim still fails because plaintiff has failed to establish pretext.  See El Sayed, 627 F.3d at 933.

---

[16]  In addition to relying on the November 8 letter, plaintiff also maintains that there was "an obvious change in tone towards plaintiff after his protected activity."  Pl.'s Br. at 12.  However, other than the corporal punishment letters discussed above, plaintiff has no evidence to support this contention.  For example, contrary to plaintiff's assertion, nothing in the record indicates that his classroom "observations became tense and fraught with criticism" after the 2004 complaint.  Id.  In fact, there is no evidence in the record regarding any of plaintiff's observations during the 2004-2005 school year.

Plaintiff raises a number of unsuccessful arguments in attempting to establish that Resnick's reliance on plaintiff's conduct at the dance was a pretext for retaliation.

First, plaintiff insists that he credibly testified that he: (1) did not ask any of the students to dance; and (2) was not intoxicated. However, that testimony does not create a factual dispute on the issue of pretext because the relevant question is not whether plaintiff, in fact, engaged in the conduct at issue, but whether Resnick believed that plaintiff did and issued him an unsatisfactory rating for non-discriminatory reasons. Given the evidence against plaintiff, which included an independent investigation conducted by SCI, no jury could conclude that Resnick acted unreasonably in rejecting plaintiff's self-serving version of events and determining that plaintiff engaged in inappropriate conduct. Evidence from numerous sources contradicted plaintiff's account. And, with the exception of Mercado, plaintiff has not even alleged that those sources discriminated or retaliated against him.

Second, plaintiff relies on the assertion in his affidavit that, at the dance, several security guards approached him and told him that management was trying to get them to say that they had seen plaintiff intoxicated when, in fact, they had not. Gray Aff. ¶ 16. That assertion, however, is inadmissible hearsay.

Third, contrary to plaintiff's argument, the evidence of student complaints to Harmon is not hearsay. Harmon's written statement reported that students came up to him and told him that plaintiff was drunk. Defs.' Ex. K. Although this evidence would not be admissible to establish that the students' comments were, in fact, made, it is admissible for the "non-hearsay" purpose of establishing that Resnick, who appears to have relied on Harmon's statement, "legitimately believed [that plaintiff] had acted improperly." Vahos v. Gen. Motors Corp., No. 06-cv-6783, 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008) (holding that investigative report was

admissible for the "non-hearsay" purpose of proving that the decision-makers who discharged plaintiff believed that he acted improperly); see also Wolff v. Brown, 128 F.3d 682, 685 (8th Cir. 1997) ("In employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay as that term is defined in Fed. R. Evid. 801(c) . . . . Rather, such documents are relevant and admissible because they help explain (or may help explain) the employer's conduct."). Even assuming arguendo that Harmon's report of the students' comments is inadmissible, plaintiff has not challenged the admissibility of the critical SCI report, which contains substantial support for Resnick's conclusion that plaintiff was intoxicated at the dance.[17]

Finally, plaintiff contends, unconvincingly, that Resnick's failure to follow Europe's disciplinary recommendation is evidence of pretext. Specifically, plaintiff's brief asserts that although Resnick initially followed Europe's suggestion when he issued plaintiff a strongly worded reprimand and warning, a month later, Resnick "suddenly decided" to terminate plaintiff. Pl.'s Br. at 13.

The record evidence, however, does not support the timeline and characterization of events set out in plaintiff's brief. Resnick completed plaintiff's unsatisfactory evaluation only two days after issuing plaintiff a letter informing him that his "misconduct [at the March 18 dance] may lead to . . . an unsatisfactory rating for the year and charges . . . which may lead to [his] termination." Pl.'s Ex. 26. The letter of reprimand proposed in Europe's e-mail and Resnick's actual June 27 letter both indicate that plaintiff's misconduct at the dance may lead to an unsatisfactory rating and plaintiff's termination. As such, Resnick's decision to give plaintiff an unsatisfactory rating and to recommend the termination of his probation does not evidence

---

[17] Even if plaintiff had challenged the admissibility of the SCI report, it would be admitted for the same purpose as Harmon's statement.

any sudden departure by Resnick from his prior course of action or any disregard of Europe's suggestion regarding the letter of reprimand.

Moreover, even if Resnick did disregard Europe's suggestions regarding appropriate discipline, that bare fact is insufficient under the circumstances to create a factual question on the issue of pretext. See Ashton v. City of Indianapolis, No. IP 01–273–C H/K, 2003 WL 1562724, at *13 (S.D. Ind. Feb. 4, 2003) (holding that supervisor's decision to disregard lower penalty recommended by discretionary "disciplinary matrix" did not show pretext), aff'd, 88 F. App'x 948 (7th Cir. 2004); Gilliam v. Lee Cnty. Sch. Bd., 2:01CV0008301, 2002 WL 31906274, at *4 (W.D. Va. Dec. 30, 2002) (granting summary judgment and explaining that school board's disagreement with superintendent's recommendation was only "weak evidence of pretext" where the record did not indicate the frequency with which the superintendent's personnel recommendations were disregarded by the board.). But see Schallop v. New York State Dep't of Law, 20 F. Supp. 2d 384, 400-01 (N.D.N.Y. 1998) (concluding that plaintiff established pretext based on, inter alia, fact that her termination was contrary to recommendation of two members of review committee, but granting summary judgment because plaintiff failed to establish that proffered reasons were a pretext for discrimination).

Notably, plaintiff has not raised any argument regarding Resnick's failure to follow Europe's suggestion that plaintiff be offered an opportunity to settle the matter by admitting fault and paying a monetary fine. In any event, Resnick's decision on that point is insufficient to establish a factual question on pretext, particularly when his decision is viewed in light of all of the surrounding circumstances. The fact that Europe was a DOE attorney weakens any probative value that her disregarded recommendation could have on the question of pretext. Lawyers and administrators may often have differing goals, incentives, and motivations concerning employee

discipline. Whereas administrators are tasked with running a school, DOE lawyers may be more focused on avoiding litigation and union grievances.

None of plaintiff's arguments raise triable issues of fact on the question of pretext. Therefore, summary judgment is warranted on all of plaintiff's retaliation claims.

**G.      Qualified Immunity and <u>Monell</u> Liability**

Because plaintiff's discrimination and retaliation claims fail, it is unnecessary to reach defendants' arguments regarding qualified immunity and liability under <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

**III.      CONCLUSION**

For the reasons outlined above, defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:  December 12, 2011
Brooklyn, New York


_____
                    /s/
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
